IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1936-04




 

RAYMOND OLIVAS
, Appellant



v.


 

THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE TENTH COURT OF APPEALS


BRAZOS COUNTY





 Cochran, J., delivered the opinion of the Court, in which Meyers,
Womack, Johnson, and Holcomb, JJ., joined. Price, J., joined Parts I and III, and
concurred in the judgment. Keller, P.J., filed a concurring opinion, in which
Keasler and Hervey, JJ., joined. 


O P I N I O N 



 A jury convicted appellant of aggravated assault by threat, stalking, and four separate
instances of evading arrest, all stemming from his futile, month-long attempt to resurrect a
short-lived affair with a married woman. On appeal, he argued that the evidence was
insufficient to prove assault by threat because the State failed to prove that the assault victim
knew that appellant had shot at her truck at the time that he acted. The court of appeals,
finding the evidence legally insufficient, reversed and rendered a judgment of acquittal. (1) The
State argues first that the court of appeals erred in finding the evidence insufficient, and
second that this Court should reconsider its decision in McGowan v. State, 664 S.W.2d 355
(Tex. Crim. App. 1984), which, according to the State, "requires a victim to perceive a threat
at the time the offense occurred" to establish assault by threat. (2) We conclude that McGowan
held only that assault by threat requires the defendant to communicate a threat of imminent
bodily injury; stabbing someone without first threatening him is a different assaultive
offense. (3) We hold that the evidence in the present case, viewed in the light most favorable
to the verdict, is legally sufficient to support the assault-by-threat conviction. We therefore
reverse the judgment of the court of appeals and remand the case to that court for further
proceedings. 

I.

 Appellant began stalking and harassing the complainant, Kim Tunnell, in November,
2001. Ms. Tunnell had been romantically involved with appellant, but, after deciding to
attempt reconciliation with her husband, she ended the relationship. Appellant began calling
Ms. Tunnell and leaving voice messages on her cell phone. While the messages were
initially innocuous, they became increasingly violent and demanding. (4)
 Ms. Tunnell began
to fear for her safety, so, on November 27, 2001, she recorded the messages that appellant
had left over a two-week period and took that recording to the police. She then went to her
attorney to get a restraining order against appellant. When she arrived at her attorney's
office, she saw appellant in the parking lot, walking toward her truck. As she tried to back
out of the parking lot to avoid him, he began hitting the passenger side window with a pistol. 
Ms. Tunnell sped off. After she was sure appellant was not following her, she returned to
her attorney's office, and her attorney called the police. 

 Just two weeks later, on December 12, 2001, Ms. Tunnell was driving to the
laundromat when appellant drove up behind her. He then drove his car into the oncoming-traffic lane, and Ms. Tunnell noticed that the front passenger window was rolled half-way
down. She recognized the car-it belonged to appellant's mother-but she could not
immediately tell who was driving it. (5) She heard a "pop," followed by another "pop," and
thought that appellant had possibly thrown rocks at her truck. She pulled into the parking lot
at the laundromat and immediately got out of her truck to see what the popping noises had
been. Appellant turned into a different entrance and drove past Ms. Tunnell; as she had
suspected, it was appellant driving his mother's car. After he left, she discovered a bullet
hole in the rear driver's side extended-cab portion of her truck, and she immediately called
the police. Ms. Tunnell testified that seeing the bullet hole made her feel "shocked," "upset,"
and "scared." She further testified that she "took [appellant's actions] as intent to harm." 
She "really didn't know if he intended to kill [her] or what the deal was." As the police
conducted their investigation at the laundromat, appellant again called Ms. Tunnell on her
cell phone. She gave the officers the number he was calling from. The police attempted to
arrest appellant, but he led them on a chase and eventually escaped. 

 Appellant called Ms. Tunnell on several occasions following this incident. On two
of those occasions, the police were able to find appellant, but both times he led the police on
high-speed chases and was able to escape arrest. (6) Finally, the police worked with Ms.
Tunnell to set up a meeting between her and appellant so that they could arrest him. She
agreed, and, on December 27, 2001, the police finally arrested appellant.

 A jury convicted appellant and sentenced him to 35 years in prison. He appealed,
arguing that the State failed to prove the element of "threaten with imminent bodily injury." 
He argued that, because Ms. Tunnell did not realize that he was shooting at her car while he
was committing the act, she had not been "threatened" as required under Texas Penal Code
Section 22.01(a)(2). The court of appeals found that Ms. Tunnell "did not perceive the threat
at the time the offense occurred," and thus, under this Court's rule in McGowan, the State
had not proven that Ms. Tunnell was threatened with imminent bodily injury. (7)II. Historically, the term assault was used to describe two different acts-one subject to
criminal liability and the other subject to civil liability. Early criminal assault was defined
as an "attempt to commit a battery." (8) Battery was the crime of physically hitting or injuring
another. (9) Thus, criminal assault was the (unsuccessful) attempt to physically hit or injure
another. In civil tort law, assault was committed when an actor "with intent to cause a
reasonable apprehension of immediate bodily harm, [did] some act which cause[d] such
apprehension." (10) Civil assault was a verbal or physical threat made with the intent to place
another in fear of physical injury and the threat does, in fact, place that person in fear.
However, many states statutorily expanded the narrow common-law definition of criminal
assault to include the tort-based definition of assault as well. (11) Thus, "assault and battery"
was both the successfully communicated threat to physically injure and the actual act of
doing so-carrying through on that threat. (12) The tort-based theory is the foundation for most
assault-by-threat statutes now in existence. The Model Penal Code includes such a
provision: "A person is guilty of assault if he . . . attempts by physical menace to put another
in fear of imminent serious bodily injury." (13)

 Nearly every jurisdiction now statutorily criminalizes assault by threat in some
manner, and most statutes specify whether the threat must be perceived or received by the
intended victim. For example, Colorado enacted a statute criminalizing menacing: "A
person commits the crime of menacing if, by any threat or physical action, he or she
knowingly places or attempts to place another person in fear of imminent serious bodily
injury." (14) This language indicates that, to commit assault, an actor need not succeed in
placing a victim in fear or in causing a victim to be aware of the threat, his attempt to do so
suffices. (15) In contrast, Idaho defines assault by threat to explicitly require the victim's
perception: "An assault is . . . [a]n intentional, unlawful threat by word or act to do violence
to the person of another, coupled with an apparent ability to do so, and doing some act which
creates a well-founded fear in such other person that such violence is imminent." (16) Thus,
some statutes require that the victim of an assault by threat (or menacing) perceive or receive
the threat, while other statutes require only that the actor communicate the threat, regardless
of whether the victim actually perceives or receives that threat.

 Texas's assault-by-threat statute states, in pertinent part: "A person commits an
offense if the person . . . intentionally or knowingly threatens another with imminent bodily
injury[.]" (17) Our statute does not explicitly indicate whether the intended victim must
perceive or receive the threat. The question turns on the meaning of the term "threaten" as
used in the Penal Code. Does it mean an act that must be perceived by the intended victim? 
Or must the actor only act with the intent that the victim perceive his threat?

 When determining a statute's meaning, a court must first attempt to interpret the
statute based on the plain meaning of the words used. (18) The word "threaten" is not statutorily
defined in the Penal Code, so we turn to the common, ordinary meaning of that word. 
Webster's Dictionary defines "threaten" in the following manners:

 1. to declare an intention of hurting or punishing; to make threats against;

 2. to be a menacing indication of (something dangerous, evil, etc.); as the
clouds threaten rain or a storm;

 3. to express intention to inflict (injury, retaliation, etc.);

 4. to be a source of danger, harm, etc. to. (19)


Significantly, each of these definitions indicates an act being performed, as opposed to an act
which is perceived by an outside party. Thus, these definitions indicate that a threat occurs,
not when the victim perceives the threat, but as soon as the actor utters the threatening words
or otherwise initiates the threatening conduct. Black's Law Dictionary defines "threat" as:
"A communicated intent to inflict harm or loss on another or on another's property . . . ." (20) 
This could indicate either an act that is communicated by the actor to another, regardless of
whether it is successfully perceived by the intended recipient, or one that is successfully
communicated to the intended recipient. Thus, after analyzing the plain meaning of the
statutory language, the Texas assault-by-threat statute remains ambiguous. We therefore
must look outside this specific statute to discern the legislative meaning of the word
"threaten." (21)

 The Texas Penal Code contains two statutes, other than assault by threat, that
specifically criminalize threats or threatening behavior. They are: terroristic threat (22) and
robbery by threat. (23) The specific phrasing of these two statutes sheds some light on the
meaning of the word "threaten" as it is used in the Texas Penal Code. 

 A person commits robbery by threat if "in the course of committing theft . . . he . . .
intentionally or knowingly threatens or places another in fear of imminent bodily injury or
death." (24) By defining robbery to be theft plus either threatening or placing another in fear,
this statute demonstrates that the term "threaten" means something other than placing a
person "in fear of imminent bodily injury or death."

 Similarly, the terroristic-threat statute states: "A person commits an offense if he
threatens to commit any offense involving violence to any person or property with intent to
place any person in fear of imminent serious bodily injury." (25) Like robbery by threat, this
statute indicates that "threaten" and "place any person in fear of imminent serious bodily
injury" have two distinct meanings. (26) Both statutes imply that one can threaten without
necessarily placing another in fear of imminent bodily injury. A logical inference from this
is that "threatening," as used in the Penal Code, does not require that the intended victim
perceive or receive the threat, but "placing another in fear of imminent bodily injury" does. 

 This interpretation of "threaten" is supported by at least one other jurisdiction. In the
District of Columbia, the assault statute reads: "Whoever unlawfully assaults, or threatens
another in a menacing manner, shall be fined . . . ." (27) This language has been interpreted as
focusing not on whether the victim was placed in fear by the threat, but whether the accused
intended to instill fear in the victim: 

 While certain conceptual aspects of tort theory have been absorbed into the
criminal offense of assault, it is not necessarily the case that the victim must
be shown factually to have experienced apprehension or fear in order to
establish the offense. In our view the better position holds that although the
question whether the defendant's conduct produced fear in the victim is
relevant, the crucial inquiry remains whether the assailant acted in such a
manner as would under the circumstances portend an immediate threat of
danger to a person of reasonable sensibility. (28)


 This intent-based theory of assault by threat also comports with the societal interest
in establishing criminal law:

 The purpose of criminal law is to define socially intolerable conduct, and to
hold conduct within the limits which are reasonably acceptable from the social
point of view. If the criminal law was one hundred percent effective there
would be no punishment, because there would be no conduct which
overstepped the boundaries it had established. An incidental but very
important function of the criminal law is to teach the difference between right
and wrong. (29)


The act of threatening violates this interest not only when the actor actually causes fear in
another, but also (1) when he creates an unacceptable risk that another may be placed in fear, 
and (2) when he increases the likelihood that he will carry through on a threat and cause a
physical injury.

 However, the court of appeals in the present case-as well as some other Texas
courts-have interpreted this Court's reasoning in McGowan v. State (30) as holding that the
Texas assault-by-threat and robbery-by-threat statutes require a victim to perceive a threat
as it occurs-that is, the offense requires a successfully communicated threat. (31) The court of
appeals reasoned that, because Ms. Tunnell did not realize that appellant was shooting at her
as he fired the shots, the evidence was legally insufficient under McGowan. (32) 

 McGowan is not that broad of a holding. That case involved a woman and her
fourteen-year-old daughter who were attacked by the defendant. (33) The evidence showed that
the defendant stabbed the daughter with a knife. As he then stood over her, holding the
knife, the girl asked him not to cut her. The mother, not seeing the knife held by the
defendant, attempted to reach down and help her daughter. As she did, the defendant stabbed
the mother in the back of the head; she did not know what she had been hit with. (34) He then
ran away. The mother testified that, while she knew she had been hit in the head and was
bleeding, it was only after the tip of the knife was retrieved from her skull, that she realized
she had been stabbed. (35) This Court held that because there was no evidence presented that
the defendant threatened the mother before stabbing her, the State failed to prove the element
of "threat" to the mother. (36) We affirmed the aggravated-assault-by-threat conviction against
the daughter because "[t]he evidence showed that after she was initially stabbed by appellant
[the daughter] saw him holding the knife and began begging appellant not to cut her. She
further testified that appellant threatened her with imminent bodily injury." (37)

 A careful examination of the cases relied upon in McGowan, as well as the language
used in the opinion itself, indicates that this Court did not define assault by threat as requiring
a victim's perception of the threat. (38) While the McGowan court did refer to the mother's lack
of testimony regarding comprehension of a threat, it was the lack of any evidence, not the
mother's lack of perception of a threat, that led this Court to conclude that the State failed
to prove assault by threat: "There is no evidence that prior to stabbing her appellant
threatened her in any way." (39) That is, the defendant just stabbed her, he did not threaten her
first. (40) Thus, a more accurate description of the holding in McGowan is that there must be
some evidence of a threat being made to sustain a conviction of assault by threat. McGowan
did not address the question of whether, under the Texas Penal Code, assault by threat
requires an intended victim to perceive the threat. That question remains open.

III.


 However, we need not definitively resolve the question of whether an alleged victim
must perceive the defendant's threat to establish the crime of assault by threat in this case. 
Even assuming, arguendo, that the State must prove Ms. Tunnell perceived the threat, there
is legally sufficient evidence to sustain the jury's verdict. In concluding that Ms. Tunnell did
not perceive a threat, the court of appeals failed to view all of the evidence in the light most
favorable to the verdict. The record is replete with evidence that Ms. Tunnell felt threatened
by appellant on several occasions leading up to the charged incident. While this evidence
does not prove that Ms. Tunnell perceived a threat on the evening in question, it does support
an inference that her state of mind on that evening was affected by appellant's previous
actions. (41) If the determination of appellant's guilt turns on whether Ms. Tunnell perceived
a threat, her state of mind as the event occurred would be a critical factor for a jury to
consider. (42) The evidence regarding Ms. Tunnell's state of mind leading up to the assault
showed:


 she felt "threatened and very uneasy" after hearing the messages that appellant left on
her voice mail on November 26, 2001;


 


 she felt "threatened . . . as though he was going to do something" to her after hearing
the message that appellant left on her voice mail on November 27, 2001;

 she recorded the messages that appellant had left on her voice mail and turned them
over to the police;

 she went to her attorney's office to obtain a restraining order against appellant;

 she was "scared" and "concerned" by appellant's actions of hitting her truck window
with a pistol, and left her attorney's parking lot out of fear for her safety; and

 she began carrying a gun "for protection" against appellant.



 Furthermore, ample evidence shows that Ms. Tunnell did perceive the threat made by
appellant at the time the offense occurred. On the evening of the charged incident:


 she saw a car that she knew belonged to appellant's mother's pull up behind her "at
a very high rate of speed." She suspected that appellant was driving the car;


 


 she then saw the car pull up next to her, driving in the oncoming traffic lane;


 


 she heard two pops that "sounded like rocks" hitting her truck;


 


 after she arrived at her destination, she looked at the side of the car to see if appellant
"had hit [her] truck with a rock or what it was";


 


 she discovered a bullet hole in the side of her truck, and immediately called the police;


 


 she was "scared" and "in disbelief" at appellant's actions and she "really didn't know
if he intended to kill [her]."



 This evidence indicates that Ms. Tunnell perceived a threat as appellant shot at her
truck. While she did not instantaneously realize that appellant had fired shots at her, she
knew that he had done something threatening to her. And she was frightened. The fact that
Ms. Tunnell perceived some threat of imminent bodily injury, coupled with the fact that
appellant did use a firearm in threatening her, is sufficient to sustain his conviction for
aggravated assault as charged in the indictment. The indictment charged that appellant "did
then and there intentionally, knowingly, and recklessly threaten Kim Tunnell with imminent
bodily injury and did then and there use and exhibit a deadly weapon, to wit: a firearm." 
Nothing in this indictment-and nothing in Texas law-requires Ms. Tunnell to accurately
perceive the exact threat that appellant communicated. At most, the State was required only
to prove that Ms. Tunnell perceived a threat and that appellant did, in fact, use or exhibit a
firearm while making that threat.

 Appellant also argues that the victim of an assault by threat must be aware "of her
imminent peril as the shots were being fired." The statute requires the State to prove that the
defendant "threaten[ed] another with imminent bodily injury," but there is no statutory
requirement that a victim must instantaneously perceive or receive that threat of imminent
bodily injury as the actor is performing it. (43) Ms. Tunnell did not comprehend that she was
being shot at as appellant fired at her car, but the realization-moments later (44)-of what he had
done nonetheless placed her in great fear. (45) 

 Because there is ample evidence to find that appellant threatened Ms. Tunnell as
required under the Texas Penal Code, we reverse the judgment of the court of appeals and
remand the case to that court to address appellant's remaining points of error.

Delivered: October 4, 2006

Publish
1. Olivas v. State, No. 10-02-00311-CR, 2004 Tex. App. LEXIS 10131 (Tex. App.-Waco
2004) (not designated for publication). The court of appeals affirmed appellant's stalking
conviction in the same opinion, and reversed three of his four convictions for evading arrest in a
separate opinion. Olivas v. State, No. 10-02-00312-CR, 2004 Tex. App. LEXIS 10134 (Tex.
App.-Waco 2004) (not designated for publication). We granted the State's petitions for
discretionary review in both cases.
2. The State's grounds for review are:

 1) Did the court of appeals incorrectly apply a legal sufficiency review and err in
concluding that the evidence was insufficient?

 2) Should this Court reconsider the holding in McGowan v. State, 664 S.W.2d 355
(Tex. Crim. App. 1984), which requires a victim to perceive a threat at the time
the offense occurred?
3. McGowan, 664 S.W.2d at 357.
4. The messages included statements such as:


 "Please just talk to me. Just pick up your phone. I don't want - I wouldn't hurt you. I
wouldn't hurt your husband. . . . I know the value of love of children and the importance
of that. I don't care how much I hate somebody, I wouldn't do that. And this isn't about
your husband or this isn't about you. This is about me and my life."
 "Kim - pick up the phone. Why you want to hurt me so bad? Why do you want to make
me so angry? It ain't f***ing worth it, Kim - if I knew where that motherf***er lived I'd
go over there and f***ing kill him right now. I'm sure - because I'm sure you've been
there. . . ."
 "You gonna stay up to 2:30 in the morning again, huh? Do you think that's going to stop
me from something, Kim? Do you think anything is going to f***ing stop me from
something? You're playing on my f***ing emotions. Nothing can f***ing stop me . . ."
 "This s*** again. Start a new f***ing case, Kim. Is that what your bulls*** is all about?
- worst thing you could do."
 "Keep this s*** up, see what happens. See what happens. You're writing your own
f***ing destiny . . . ."
 "Pick up the damn phone before I f***ing come over there break through the f***ing
front door."
 "[F]***ing lock yourself in your house - I guess you'll have to see, won't you . . . you're
going to f***ing pay for it. I learned my lesson the first time - count your friggin'
hours."



5. Ms. Tunnell stated that she suspected that it was appellant "the entire time" but she did
not know for sure until she was standing outside of her truck in the laundromat parking lot.
6. These chases, along with the chase on December 12, 2001, are the bases of the three
convictions for evading arrest.
7. Olivas, 2004 Tex. App. LEXIS 10131 at *3.
8. See Model Penal Code § 211.1, cmt. at 176-77 (1980). 
9. Id. 
10. 2 Wayne R. LaFave, Substantive Criminal Law §16.3(b) at 568 (2d ed. 2003). 
For example, "if, with the intention of hitting X, D wrongfully threw a stone that X barely
managed to dodge, then D would have been guilty of a criminal assault because he had attempted
to commit a battery, and he would also have been liable in civil action of trespass for assault
because he had wrongfully placed X in apprehension of physical harm." Rollin M. Perkins,
Criminal Law 159 (3d ed. 1982). If, on the other hand, D-an ace pitcher-had thrown the stone
intending to scare X but carefully aiming his fastball four inches above X's head (acting with the
intent to frighten X, but not to physically harm him), then X would be liable for civil assault, but
not guilty of criminal assault under the common law.
11. Model Penal Code § 211.1, cmt. at 177 (noting that "[t]he majority of jurisdictions at
the time the Model Code was drafted had assimilated this civil notion of assault into the criminal
law"). See, e.g., Alaska Stat. § 11.41.230 ("A person commits the crime of assault in the
fourth degree if . . . by words or other conduct that person recklessly places another person in fear
of imminent physical injury."). According to Professor Perkins, 

 An assault is (1) an attempt to commit battery or (2) an intentional placing of
another in apprehension of receiving an immediate battery. Furthermore, (3) an
assault is included in any actual battery.

 Perkins at 159.
12. Perkins at 159.
13. Model Penal Code § 211.1(1)(c). 
14. Colo. Rev. Stat. § 18-3-206(1).
15. See People v. Stout, 193 Colo. 466, 467, 586 P.2d 52, 53-54 (Colo. 1977) ("The statute
provides for conviction if the defendant 'attempts' to place another in fear, and thus, actual
subjective fear on the part of the victim is not a necessary element of this crime."); see also Or.
Rev. Stat. § 163.190 ( "A person commits the crime of menacing if by word or conduct the
person intentionally attempts to place another person in fear of imminent serious physical
injury"); State v. Lockwood, 43 Ore. App. 639, 642-43, 603 P.2d 1231, 1233 (1979) ("Menacing
consists of intentionally attempting to place another person in fear of imminent serious physical
injury. The victim's subjective state of mind is not a defined element of the crime. The victim's
testimony is not essential."; noting that the commentary to the statute includes an example that
the "intended victim is unaware of the actor's threat, e.g., he is blind and does not know the actor
is pointing a gun at him").
16. Idaho Code Ann. § 18-901(b).
17. Tex. Penal Code § 22.01(a)(2).
18. Calton v. State, 176 S.W.3d 231, 233 (Tex. Crim. App. 2005) (citing State v. Mason,
980 S.W.2d 635, 638 (Tex. Crim. App. 1998), and Boykin v. State, 818 S.W.2d 782, 785 (Tex.
Crim. App. 1991)).
19. Noah Webster, Webster's New Twentieth Century Dictionary of the English
Language Unabridged 1901 (2d ed. 1983).
20. Black's Law Dictionary 1203 (7th ed. 2000).
21. Boykin, 818 S.W.2d at 786.
22. See Tex. Penal Code § 22.07(a)(2).
23. See Tex. Penal Code § 29.02(a)(2).
24. Id.
25. Tex. Penal Code § 22.07(a)(2).
26. A person must both threaten to commit some act and must do so with the intent to
place another in fear to be convicted of terroristic threat. However, "it is not necessary that the
victim or anyone else was actually placed in fear of imminent serious bodily injury. . . . All that
is necessary to complete the offense is that the accused by his threat sought as a desired reaction
to place a person in fear of imminent serious bodily injury." Dues v. State, 634 S.W.2d 304, 305-06 (Tex. Crim. App. 1982). This interpretation is based on the plain meaning of the statute
which specifically requires only the intent to "place any person in fear of imminent serious bodily
injury." Tex. Penal Code § 22.07(a)(2).
27. D.C. Code § 22-404(a).
28. Anthony v. United States, 361 A.2d 202, 206 (D.C. 1976) (footnote omitted); see also
Chapman v. State, 78 Ala. 463, 465 (Ala. 1885) (noting that "one may obviously be assaulted,
although in complete ignorance of the fact, and, therefore, entirely free from alarm" if the
defendant intended to injure and had the ability to do so); State v. Adamo, 9 N.J. Super. 7, 10, 74
A.2d 341, 342 (App. Div. 1950) (upholding strike leader's assault conviction on proof that he,
along with others, threw stones into building where supervisors had retreated with the intent to
injure anyone in the building; prosecution was not required to show that any of the supervisors
were actually placed in fear of imminent bodily injury because "apprehension upon the part of a
complaining witness is not an essential element of simple assault").
29. Rollin M. Perkins, Criminal Law 5 (3d ed. 1982).
30. 664 S.W.2d 355 (Tex. Crim. App. 1984).
31. See Rose v. State, 2006 Tex. App. LEXIS 3705, *8 (Tex. App.-Dallas 2006, no pet. h.)
(not designated for publication) (stating that evidence was sufficient to establish assault by threat
because victim perceived his peril at the time defendant drove toward him in his car, and he felt
threatened); Armitige v. State, 1999 Tex. App. LEXIS 1366, *7-8 (Tex. App.-San Antonio 1999,
no pet.) (not designated for publication) (citing McGowan for the proposition that "[w]hen
robbery is committed, the defendant must display a weapon, or demonstrate the use of a weapon,
and the complainant must witness the act of display or demonstration to establish a threat");
Richardson v. State, 1992 Tex. App. LEXIS 1775, *4 (Tex. App.-Houston [1st Dist.] 1992, pet.
ref'd) (not designated for publication) (stating that "the McGowan court held the evidence was
insufficient to show the defendant used a knife to threaten the complainant because the
complainant never saw the defendant holding a knife, nor did she testify that defendant
threatened her with a knife"). See also Edwards v. State, 57 S.W.3d 677, 682 (Tex.
App.-Beaumont 2001, pet. ref'd) (Burgess, J. dissenting) (arguing that evidence was insufficient
to show an assault by threat because police-officer victim never perceived the threat posed by the
defendant; "I would urge our Court of Criminal Appeals to review this case, overrule McGowan
and affirm the majority. But until it does so, I must follow McGowan."). However, other courts
have read McGowan less restrictively, requiring only that the State present some evidence of an
attempted communication of a threat to sustain an assault by threat charge. See Edwards, 57
S.W.3d at 680-81 (stating that the evidence supported an inference that the defendant intended to
kill police-officer victim, but was thwarted by fellow officer; "As we learned from McGowan,
however, Section 22.01(a)(2) requires proof not of an intent to commit an assault by bodily
injury, but of an intent to cause in the victim a reasonable apprehension of imminent bodily
injury"); Tullos v. State, 698 S.W.2d 488, 490 (Tex. App.-Corpus Christi 1985, no pet.)
(evidence was insufficient to establish assault by threat because, as in McGowan, defendant
simply stabbed victim without making any threat; witness "testified that the stabbing was just a
spur of the moment thing, and that after the stabbing appellant made no threats"); Eubanks v.
State, 2005 Tex. App. LEXIS 47, *9-11 (Tex. App.-Dallas 2005, no pet.) (not designated for
publication) (citing McGowan and stating that "the question before the jury was not whether
Eubanks intended to commit an assault by bodily injury, but whether Eubanks intended for
Gorman to fear imminent bodily injury").
32. Olivas, 2004 Tex. App. LEXIS 10131 at *3-4.
33. McGowan, 664 S.W.2d at 357.
34. Id.
35. Id.
36. Id.
37. Id. at 358.
38. The first case relied upon in McGowan is Taylor v. State, 637 S.W.2d 929 (Tex. Crim.
App. 1982). In Taylor, the defendant and two others robbed a grocery store. One co-defendant
had a gun, but the defendant and the third conspirator had no weapon. The appellant attacked the
cashier, Mrs. Gregorcyk, and threatened to kill her if she did not remain quiet. He then restrained
her as the other unarmed conspirator stole money from the register. The armed co-defendant was
in the back of the store during the entire robbery. He threatened another store employee with the
gun, but never approached Mrs. Gregorcyk. Although Mrs. Gregorcyk testified that she had seen
what appeared to be the "imprint of a small pistol in the front pants pocket of the appellant's co-defendant . . . she never saw a gun displayed. She was 'placed in fear of imminent bodily injury
through the . . . beating [she sustained] and not through the use of a handgun.'" Id. at 931. This
Court found that, because the State failed to prove that the defendant used a deadly weapon to
threaten Mrs. Gregorcyk, the aggravated robbery conviction could not stand. Id. at 933. We
noted, however, that the evidence that appellant committed simple robbery by threat was
"overwhelming, and in accordance with [the penal code statute]." Id.

 The second case cited in McGowan is Benjamin v. State, 621 S.W.2d 617 (Tex. Crim.
App. 1981). In Benjamin, a bystander was shot when the defendant and a co-worker began
fighting. The court held that "[t]he evidence fail[ed] to establish that any threats were made" to
the bystander. Id. at 619. That is, the bystander was simply shot; he was never threatened first.
39. McGowan, 664 S.W.2d at 357 (emphasis added).
40. An actor might threaten to stab by holding a knife overhead and telling the victim, "I'll
kill you," or by his conduct of waving the knife in the air or making some other threatening
gesture. An actor might commit attempted assault by stabbing at the victim and fortuitously
missing. An actor might commit assault by successfully stabbing the victim, with or without any
threats. Or he might do all three.
41. Appellant argues that the incidents leading up to the shooting "do not address the
victim's perception and awareness of her imminent peril as the shots were being fired." We
disagree. The previous incidents support a logical inference that Ms. Tunnell was in a more
cautious state of mind and heightened awareness. Evidence such as the fact that she started
carrying a gun and had become "cautious of [her] surroundings" supports an inference that Ms.
Tunnell was more likely both to perceive a threat made by appellant and more likely to perceive
his acts as constituting a threat.
42. The State also argues that "[the] fact that appellant continued to aggressively stalk and
threaten Tunnell immediately after the December 12th offense could also be considered by a
rational jury as evidence that [Ms.] Tunnell was threatened with imminent bodily injury on
December 12
th." While we agree that the post-December 12th evidence of stalking does tend to
make it more likely that appellant's actions on December 12th were threats (or at least attempted
threats), such evidence could not have been used by the jury-and cannot be used by this Court-to
find that Ms. Tunnell was more likely to have perceived the December 12th threat when it
occurred. While her subjective state of mind could have been affected by events occurring
before the alleged incident, it could not have been affected by those occurring after that incident.
43. For example, in the context of a terroristic threat, a threatening note left on a victim's
doorstep cannot be received at the instant it is written, nor at the instant it is left. However, the
victim, arriving home moments (or even hours) later, still receives the communicated threat as if
the words came directly from the actor's mouth. Or some may recall the scene in Fatal
Attraction, when Glen Close left the pet rabbit in a pot of boiling water for her lover's wife to
find. Nobody saw her as she dropped the bunny into the boiling water. No one knew how long it
sat on the stove. Yet the unsuspecting wife certainly received the threat when she came home to
find the bubbling pot. In neither the context of a terroristic threat or of an assault by threat is the
victim required to perceive the threat at the very instant of the defendant's threatening act.
44. The record is unclear as to precisely how much time passed between the moment
appellant shot at Ms. Tunnell and the time that she reached the laundromat. However, the
evidence does show that Ms. Tunnell was driving down the road that the laundromat was located
on when appellant fired the shots.
45. This is evidenced by her testimony: 

Q. [W]hat did you do after you noticed the bullet hole in the truck?

A. I called the police.

Q. How did you feel?

A. I was shocked. I was upset. I was scared. I was in disbelief. I really could not believe
that he did that.

...

Q. How did you take the actions of the defendant towards you? How did you take that?

A. I took them as intent to harm me. As - I really didn't know if he intended to kill me or
what the deal was.